UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, et al.,

Plaintiffs,

v.

MARK MICHAEL OTTOVICH,

Defendant.

Case No.  11-cv-01793-JSW   (JCS)

**REPORT AND RECOMMENDATION RE PETITIONER'S MOTION FOR ENTRY OF JUDGMENT OF CONTEMPT AND RESPONDENT'S MOTION FOR TERMINATING SUMMONS PER EQUITABLE RECOUPMENT AND/OR REQUEST FOR QUALIFIED DETERMINATION**

**Dkt. Nos. 53, 62**

## I.  INTRODUCTION

United States District Court Judge Jeffrey S. White issued an order holding Respondent Mark Ottovich in civil contempt for failure to comply with his previous order enforcing a summons served by the Internal Revenue Service ("IRS").  The contempt order imposes a $500 per day fine upon Respondent until he complies with the enforcement order, but purges him of that fine if he complies before April 1, 2013.  While Respondent appeared before the IRS for an interview on April 1, 2013, Petitioner United States contends that Respondent failed to provide sworn testimony with regard to issues specified in the summons, and therefore, has still failed to comply with the enforcement order.  Petitioner filed a Motion for Entry of Judgment of Contempt, requesting that Respondent be fined $7,500 so that this matter may be closed.  Respondent filed a Motion for Terminating Summons per Equitable Recoupment and/or Request for Qualified Determination.  For the reasons stated below, it is recommended that Petitioner's Motion for Entry of Judgment of Contempt be GRANTED and Respondent's Motion be DENIED.

//

## II.     BACKGROUND

### A.     Factual Background regarding the Tax Liability of the Estate of Jeanette Ottovich and Respondent's Purported Knowledge Thereof

Respondent Mark Ottovich is the son of the late Jeanette Ottovich.  *See* Dkt. No. 16 (Declaration of Mark Ottovich in Opposition to Order to Show Cause re Enforcement) (Ottovich Decl. re Enforcement) ¶ 2.  Three of Respondent's three siblings, Harvey Ottovich, Randy Ottovich, and Karen Rayl, are executors of the Estate of Jeanette Ottovich.  On May 23, 2002, Respondent's sister Ms. Rayl filed a Form 706 regarding the tax owed by the Estate of Jeanette Ottovich for the period ending in November 2001, which Respondent asserts "was wrong in a number of crucial aspects."  *Id*. ¶ 3.  Respondent declares that because his sister Ms. Rayl "was unfamiliar with the business affairs of her brothers, she included a number of assets in the estate that actually belonged to [Respondent] and [his] brother Harvey Ottovich."  *Id.*

On September 20. 2007, Ms. Rayl filed an amended Form 706 for the Estate of Jeanette Ottovich with the assistance of a Certified Public Accountant.  *See* Declaration of Karen Rayl in Opposition to Order to Show Cause re Contempt, *United States v. Karen E.* Rayl, No. 10-5426-MMC, (N.D. Cal.), Dkt. No. 19 ¶ 5 and Exhibit B thereto.[1]  Respondent contends that this amended Form 706 corrected the errors included in the original Form 706 and shows that no tax is owed.

In other cases involving Respondent and his siblings, Respondent has indicated that he has knowledge regarding certain assets included on the original Form 706 for the Estate of Jeanette

---

[1] The IRS also served a summons upon Ms. Rayl, and United States District Court Judge Maxine M. Chesney granted the United States' verified petition to enforce the IRS summons.  *See United States v. Karen E.* Rayl, No. 10-5426-MMC, (N.D. Cal.), Dkt. No. 1, 9.  After Ms. Rayl failed to comply with the order enforcing the IRS summons, Judge Chesney issued an order finding Ms. Rayl in contempt on July 8, 2011.  *Id*., Dkt. No. 27. On July 20, 2011, Ms. Rayl appealed the contempt order, but the appeal was dismissed because Ms. Rayl did not submit an opening brief tot he Ninth Circuit.  *See* Dkt. Nos. 28, 33.

IRS Officer Adam Nolan writes in a declaration that Ms. Rayl appeared for an interview in July 2011, and "confirmed that Mark and Harvey Ottovich conceived of the idea to form M.O.R.E. Partners LLC."  Declaration of Adam Nolan ¶ 7.  Mr. Nolan writes that when Ms. Rayl was asked about payment into and from the Ottovich Family Revocable Trust, Ms. Rayl stated that "Mark Ottovich provided her checks related to the trust, but she did not know the source.  In addition, the trust account was used to make payments to Mark Ottovich, including a $150,000 payment on March 3, 2007."  *Id*. ¶ 8.

United States District Court
Northern District of California

Ottovich.  For instance, Respondent's brother Harvey Ottovich filed a voluntary petition for bankruptcy in the Bankruptcy Court for the Northern District of California.  Voluntary Petition, *In re Harvey G. Ottovich*, No. 11-73193 (Bankr. N.D. Cal.), Dkt. No. 1.  Respondent filed a declaration in this proceeding in which he writes about certain properties related to the summons:

> I began buying property when I was about 21 years old.  I would buy properties in the name of "Mark Ottovich or assigns".  In escrow I would assign the properties to our parents, who would take title in their names and qualify for loans.  I purchased the property at 37231 Mission Blvd. Fremont, CA in that fashion and I purchased another property at 37255 Mission Blvd. Fremont, CA that same way.  I then purchased 303 Laurel Ave. Hayward, CA.  I then purchased 15600 Lorenzo Ave. San Lorenzo, CA and 15601 Washington Ave. in San Lorenzo.

> Before our parents died, I needed to re-finance 37231 Mission Blvd. Fremont, CA and 303 Laurel Ave. Hayward, CA.  We transferred these properties into both my brother Randy's and Harvey's name. We qualified for the loans and left the title the way it was, but it was always understood that this was still my property.

> The property at 303 Laurel Ave. Hayward, CA went from my father's name to my brother Randy's and his wife's name.  They later transferred the property in Harvey's name alone.

> The properties 15600 Lorenzo Ave. San Lorenzo, CA and 15601 Washington Ave. in San Lorenzo, CA were still in our father's name when he died.  In a court stipulation, 15600 Lorenzo Ave. was transferred to both Harvey and to me.  15601 Washington Ave. went first into an LLC, M.O.R.E. Partners, LLC, where it was transferred to all of my siblings equally to get a tax exclusion, and eventually was placed in my sister's name alone.

> I have rented the properties, made all payments, (although payments were frequently made from an account in Harvey's name where I was the authorized signer), and I remodeled each of the properties. Further, I have lived in 37231 Mission Blvd since it was purchased that is about 35 years.

*Id.*, Dkt. No. 43 ¶¶ 8-12.  Respondent submitted another declaration in Harvey Ottovich's voluntary bankruptcy case, in which he wrote that he was "the equitable owner of all the properties."  *Id.*, Dkt. No. 65 ¶ 26.  He wrote that even if Harvey Ottovich held properties in his name, "Harvey has never been involved in property management such as talking to prospective

United States District Court
Northern District of California

1  tenants or the collection of rents." *Id.* ¶ 4.  He further wrote: "The money goes to me Mark

2  Ottovich and also has on all properties in Harvey's name." *Id.*

3      On May 31, 2012, United States Bankruptcy Court Judge Roger L. Efremsky issued an

4  order requiring Respondent to appear and produce documents relating to any trust agreements or

5  leases relating to 303 Laurel Aveune, Hawyard, CA, 37231 Mission Blvd., Fremont, CA, and

6  37255 Mission Blvd, Fremont, CA, as well as any funds collected from such properties.  *Id.*, Dkt.

7  No. 50.  Respondent was also required to produce all agreements for the LLCs which have an

8  interest in 15601 Washington, San Lorenzo, CA and 36224 Pecan Court, Fremont, CA, as well as

9  the latest three tax returns for the LLC.  *Id.*  Respondent failed to appear for an examination and

10  produce these documents, and on July 26, 2012, Judge Efremsky issued an order finding

11  Respondent in contempt and ordered his arrest.

12      On July 11, 2012, Respondent, along with M.O.R.E. LLC and his siblings Randy Ottovich

13  and Karen Rayl, filed a complaint in this district against the IRS alleging wrongful levy and

14  seeking to quiet title on certain properties.  That complaint alleges that "at all times, the sole

15  equitable owner of [the property located at 15601 Washington Avenue, San Lorenzo, California]

16  was Mark Ottovich."  *See* Complaint, *M.O.R.E. LLC, et al. v. United States, et al.*, No. 12-3609-

17  JST (N.D. Cal. July 11, 2012), Dkt. No. 1 ¶ 25.  The complaint further specified that Respondent

18  purchased this property "and assigned title to his parents out of escrow pursuant to an oral trust

19  agreement whereby Mark retained equitable ownership…." *Id.* ¶ 15.

20      On October 2, 2013, the parties stipulated to stay this case—which is currently awaiting

21  approval—pending resolution of Tax Court Case Number 025781-12L.  *See* Stipulation to Stay or

22  Hold Case in Abeyance, *M.O.R.E. LLC, et al. v. United States, et al.*, No. 12-3609-JST (N.D. Cal.

23  July 11, 2012), Dkt. No. 55.  The Tax Court case was filed by the Estate of Jeanette Ottovich to

24  contest a lien imposed by the IRS on various assets.  *See id.*

25      On February 4, 2013, Respondent filed a voluntary petition for bankruptcy.  In the petition,

26  Respondent represents that he had either "legal, equitable, or future interest" in the property

27  located at 32755 Mission Boulevard.  *See* Voluntary Petition, *In re Mark Ottovich*, No. 13-40649

28  (Bankr. N.D. Cal.), Dkt. No. 1 at 7.

### B.      Procedural Background Leading to Entry of Contempt

On April 13, 2011, the United States filed a Verified Petition to Enforce an Internal Revenue Service Summons served upon Respondent Mark Ottovich.  Dkt. No. 1 (Petition).  The Petition indicates that pursuant to an IRS summons, Respondent was required to appear at the IRS Oakland office on October 5, 2010 to give testimony and produce documents relating to the Estate of Jeanette Ottovich.  *Id.* ¶ 7 and Exhibit A thereto (Summons).  After Respondent failed to appear on October 5, 2010, the IRS scheduled another appointment on November 4, 2010.  *Id.* ¶¶ 9-10 and Exhibit B thereto.  The Verified Petition indicates that Respondent had failed to comply with the Summons by the time of its filing.  *Id.* ¶ 11.

On April 18, 2011, United States Magistrate Judge Laurel Beeler issued an Order to Show Cause requiring Respondent to appear on June 30, 2011 and show cause why he should not be compelled to appear and provide documents and testimony as required by the Summons.  Dkt. No. 5.  Respondent submitted a declination to proceed before a United States Magistrate Judge and the case was reassigned to United States District Court Judge Jeffrey. S. White.  Dkt. Nos. 6-9.

Judge White issued an Order to Show Cause requiring Respondent to appear on July 29, 2011.  Dkt. No. 14.  Judge White then granted Respondent's request for a continuance due to health reasons, and continued the hearing on the Order to Show Cause to September 2, 2011.  Dkt. Nos. 20-21.  On September 1, 2011, Judge White denied Respondent's second request for a continuance due to health reasons.  Respondent did not appear at the September 2, 2011 hearing before Judge White.  Dkt. No. 27.

By order dated September 2, 2011, Judge White granted the verified petition to enforce the IRS summons.  Dkt. No. 26.  Applying the factors set forth in *United States v. Powell*, 379 U.S. 48, 57-58 (1964), Judge White found that Petitioner had satisfied its burden of establishing a prima facie case for enforcement of the summons, and that Respondent had not met his "heavy burden" of showing an abuse of process or lack of good faith on part of the IRS.  *Id.* at 2-4.  Judge White ordered Respondent to provide the records and testimony requested in the summons by September 30, 2011.  *Id.* at 4.

On September 28, 2011, Respondent appealed Judge White's order enforcing the IRS

summons to the Ninth Circuit.  Dkt. No. 30.  While Respondent's appeal was pending, Judge

White denied Petitioner's first motion for an order finding Respondent in contempt.  Dkt. No. 37.

The Ninth Circuit affirmed Judge White's ordering enforcing the IRS summons.  Dkt. No. 41.  On

February 27, 2013, Judge White granted Petitioner's second motion for an order finding

Respondent in contempt.  Dkt. No. 48.

Judge White's order finding Respondent in contempt provides, in relevant part:

> The Court having considered the record herein, it is hereby

> **ORDERED** that Respondent Mark Ottovich is in contempt of this
> Court's Order Enforcing Summons, and Respondent is fined $500
> per day from March 1, 201[3], until the date that he complies with
> the Order Enforcing Summons.

> **IT IS FURTHER ORDERED** that if Respondent Mark Ottovich
> complies with the Order Enforcing the Summons within thirty days
> of this date, by personally appearing before Adam Nolan, 1301 Clay
> Street, Suite 1040-South, Oakland California, and producing the
> records and testimony sought in the summons on or before April 1,
> 2013, he will be purged of the $500 per day fine that might have
> accrued against him for his failure to comply with the Order.

Dkt. No. 48 at 2.

### C.    Facts Relating to Respondent's Compliance with the Enforcement Order

On February 25, 2013, prior to the issuance of Judge White's February 27, 2013 order

finding Respondent in contempt, a woman claiming to be Respondent's assistant called

Petitioner's counsel, Mr. Thomas Newman, to arrange a time for Respondent's "deposition."

Declaration of Thomas Newman ("Newman Decl.") ¶ 5.  Mr. Newman asked the woman to have

Respondent contact him directly.  *Id*.  On February 26, 2013, Respondent sent a facsimile to the

U.S. Attorney's Office stating that unless he received an e-mail from the government with dates

for the deposition, he would not appear.  *Id*. ¶ 6.

An IRS Officer notified Mr. Newman that Respondent sent a letter to the IRS Office,

received on March 22, 2013, in which Respondent proposed a meeting on March 30, 2013.  *Id*. ¶

6.  March 30, 2013 was a Saturday.  Mr. Newman wrote to Respondent to tell him that an IRS

employee could not meet him on a Saturday.  *Id*.  Respondent then wrote to the IRS Officer and

arranged to meet on the following Monday, April 1, 2013.  *Id*.  On Saturday, March 30, 2013,

Respondent sent Mr. Newman an e-mail stating: "Hay Thomas, Mr. Nolan said I can come to the depo on Monday, that is Easter and I believe all Courts are closed.  So is this a trick or what." *Id.* Mr. Newman responded and notified Respondent that the Easter holiday was not on Monday, April 1, 2013. *Id.*

On April 1, 2013, Respondent appeared for his interview with IRS Officer Adam Nolan. Declaration of Adam Nolan ("Nolan Decl.") ¶ 10; Defendant Mark Ottovich's Declaration in Support of Opposition to Motion for Contempt ("Ottovich Decl.") ¶ 2.  A transcript of the April 1, 2013 interview is attached as Exhibit 1 to Respondent's declaration. *See* Ottovich Decl. Ex. 1 ("Transcript").  Before responding to any questions, Respondent gave Mr. Nolan a statement asserting his Fifth Amendment rights. *See* Transcript at 4; Nolan Decl. ¶ 10.

One of Mr. Nolan's first questions was whether Respondent was taking any medication that would affect his memory and/or responses to questions asked during the interview.  Transcript at 4:19-21.  Mr. Ottovich responded as follows:

> A: I am taking stuff for memory.
> Q: Okay.  What are you taking?
> A: I don't know the name.
> Q: So you're taking medication for memory but you don't know exactly what. And do you know if that has an affect on your memory?  Will that have an affect on this interview today?
> A: I don't know what questions you're going to be asking me.
> Q: Okay.  Do you have any medical conditions that would affect your ability to answer the questions asked during this interview?
> ….
> A: I don't believe so.

Transcript at 4:22-5:13.

Before most questions were asked, Respondent explained why questions regarding his personal life were irrelevant to the Estate of Jeanette Ottovich.  When asked whether he had children, Respondent objected on grounds that:

> This has nothing to do with the Estate of Jeanette Ottovich.  This is my personal − personal information and I don't feel that IRS is needed … First of all, I am not a beneficiary of the Estate … No. 2,

there's a 10-year statute of limitation that's already been ruled on by
IRS.  So whether I have $10 or not, under the statute you're not able
to collect it, so.

Transcript at 6:19-7:10.  Respondent ultimately refused to indicate whether he had any children by

asserting Fifth Amendment privilege.  *Id*. at 7:13.  The interview then continued with the

following exchange:

> Q: What is your present occupation?
> A: I have no occupation.
> Q: What are your current income sources?
> A: I have no income sources.
> Q: How long have you lived at your current residence?
> A: I don't remember.
> Q: Do you pay mortgage?
> A: No.
> Q: Do you pay rent?
> A: No.

Transcript at 7:15-24.

Respondent answered the following questions regarding the property located at 15600

Lorenzo Avenue, San Lorenzo, California:

> Q: Who is the current owner of the property?
> A: Current owner of what property?
> Q: 15600 Lorenzo Avenue, San Lorenzo
> A: Hmm, I believe it's still under the Estate of Jack and
> Jeanette Ottovich.
> Q: Is there a mortgage on this property?
> A: Hmm, I believe so…
> Q: … Who pays that mortgage?
> A: Hmm, nobody is paying that mortgage.
> Q: Who lives at the property?
> A: Hmm, I don't − I don't remember the name.
> Q: Is the person who lives there paying rent?
> A: I believe so.
> Q: Who does he pay rent to?
> A: Hmm, I'm going to − hmm, plead the Fifth Amendment.

Transcript at 10:25-12:4.

With respect to the property located at 37231 Mission Boulevard, Fremont, California, the

property which Respondent indicated is his residence, Respondent testified as follows:

> Q: Okay.  Referring to the property now at 37231 Mission
> Boulevard, Fremont, that is listed on the Schedule E of the
> 706 Return, do you know if that property has been
> transferred or disposed of since the death of Jeanette

United States District Court
Northern District of California

8

Ottovich and since the 706 Return was filed?
A: That property was taken off the 706.
Q: Who is the current owner of the property at 37231
Mission Boulevard, Fremont?
A: I'm just going to go ahead and plead the Fifth.  It has no
relevancy.  It's not on the Amended 706 or the Supplemental
706.
Q: The Amended 706 was not accepted by the IRS.
A: There was never a denial in writing from the IRS in
regards to that 706.  And it wouldn't make any difference −
hmm − strike that.
Q: Who is currently living at the property 37231 Mission
Boulevard?
A: I am.  Actually − strike − well, that's okay.

Transcript at 12:23-13:12.

There several more questions to which Respondent did not respond, and instead, asserted

privilege under the Fifth Amendment.  Respondent asserted Fifth Amendment privilege, and

refused to answer questions regarding: the last two digits of his Social Security number (*Id*. at 6:1-

6); Respondent's involvement with the Estate of Jeanette Ottovich, and in particular, whether he

was involved in the liquidation of the assets of the estate and what happened to those assets (*Id*. at

17:14-25); the individuals who have access to The Ottovich Family Trust (*Id*. at 18:1-9); whether

Respondent is a party to a lawsuit (*Id*. at 18:19-20); whether Respondent ever filed for bankruptcy

(*Id*. at 18:21-22); whether Respondent is a beneficiary of any trust, estate or life insurance policy

(*Id*. at 19:1-3); Respondent's date of birth (*Id*. at 19:19-20); whether Harvey Ottovich pays

Respondent's bills  with cash or writes a check (*Id*. at 22:5-7); the occupation of Respondent's

sister Karen Rayl (*Id*. at 22:7-20); and where Harvey Ottovich does his banking (*Id*. at 23:3-9).

Respondent also testified to not owning any real or personal property of any value.  When

asked how he pays for his personal expenses, Respondent indicated that his brother Harvey

Ottovich paid for them.  Respondent provided vague answers and then pleaded Fifth Amendment

privilege when Mr. Nolan asked for more specifics:

Q: How much cash do you have on hand, that's any cash
that's not in a bank account?
A: $25.
Q: Where do you do your personal banking?
A: I don't.  I don't do personal − I don't have no − I don't do
personal banking.
Q: Do you have any bank accounts that you have any access
to?

United States District Court
Northern District of California

1   A: No.
Q: Are you a signer on any bank accounts?
2   A: Nope.
Q: Do you have any credit cards?
3   A: Nope.
Q: Life insurance?
4   A: Nope.
Q: Do you have any personal vehicles?
5   A: Nope.
Q: There's no vehicles which are registered in your name?
6   A: I don't think so.
Q: Do you have any personal assets, furniture, art work, jewelry, collections, coins, guns, antiques, anything of a personal nature that is in your name?
7
8   A: Just clothes.
Q: And what are the value of all your personal assets….
A: None.
9   Q: Zero.
A: The clothes that I'm wearing is not worth anything.
10  Q: Okay. So you said you have no income sources?
A: That's correct.
11  Q: Okay. And you don't have any expenses?
A: Nope.
12  Q: Okay. Okay. The property at − let's go back. The property at 37231 Mission Boulevard, that's where you're residing. Do you have electricity at that building?
13
A: Yeah.
14  Q: Okay. Who pays for that electricity?
A: Harvey.
15  Q: How about the garbage, garbage bills there, any other utilities, water, who pays those property expenses?
16  A: I think I'm just going to object that this has nothing to do with my mom's estate. I've already states that I don't pay any of this stuff. It's not my money.
17
Q: How do you afford to pay your personal expenses, not including the property, but as far as your food and anything that you need to pay for, just your necessary living expenses, who pays those?
18
19
A: Harvey.
20  Q: Okay. And how does he pay those for you? Does he give you cash? Does he write you a check?
21  A:  I'll plead the Fifth.

22  The interview ended with the following exchange:

23  Q: Records show that on April 4th, 2011 Karen [Rayl] filed a complaint against you and Harvey seeking damages of $450,000. Do you know what the history is behind this complaint?
24
25  A: I plead the Fifth.
Q: Do you know what the current status of this complaint is?
26  A: Uh-uh.
Q: What is MORE Partners LLC?
27  A: I plead the Fifth.
Q: Is MORE Partners LLC the same thing as MORE LLC?
28  A: Hmm…

Q: Is it a different company?  Is it two companies or is this one company?
A: I only know MORE Partners.
Q: What is the purpose of its existence?
A: I plead the Fifth.
Q: Are there any employees of that company?
A: I plead the Fifth.
Q: Do you have any interest in the company?
A: Nope.
Q: Do you have any control of the company?
A: Nope.
Q: Why was the property transferred to this company?
A: I don't know.
Q: Who has control of this company?  Who are the members or managing members of the corporate officers of the company?
A: I don't remember.
Q: Who created the company?
A: Hmmm, I think I'm just going to plead the Fifth.
Q: Was there any compensation paid for that transfer?
A: I'm going to plead the Fifth.
Q: Was the transfer in accordance to a trust or a will?
A: I'm going to plead the Fifth.
Q: You said your personal phone number was (xxx-xxxx), is that a home number or is that a cell phone number?
A: I'm going to plead the Fifth.
Q: Okay.  I'm going to ask you to sign this financial statement.
A: I'm not signing anything.
Q: You're not signing it?
A: (Shaking of head.)  I have no lawyer with me.
Q: Okay.  The interview is complete.

Transcript at 24:7-25:25.

At the conclusion of the interview, Respondent was arrested pursuant to a warrant issued by the U.S. Bankruptcy Court.  *See* Newman Decl. Ex. 3 (Order to Apprehend and Arrest Mark Ottovich re: Contempt of Court).  Respondent was released by court order on April 10, 2013 when it appeared that further incarceration would not lead to Respondent's cooperation.  Newman Decl. Ex. 5.

## III.  PETITIONER'S MOTION FOR ENTRY OF JUDGMENT FOR CONTEMPT[2]

---

[2] Under 28 U.S.C. § 636(e)(6), a magistrate judge is required to "certify the facts to a district court judge" when, in a proceeding that has been referred to the magistrate judge under subsection (b) of 28 U.S.C. § 636, there is the commission of any "act [that] constitutes a civil contempt."  28 U.S.C. § 636(e)(6)(B).  Section 636(e)(6) does not apply to this case, however, where the district court judge referred a motion for judgment of entry of contempt, but there has been no "act [that] constitutes a civil contempt" since the motion was referred.  *See id*. Nevertheless, if the court finds that § 636(e)(6) applies in this case, the undersigned hereby

United States District Court
Northern District of California

1    On August 5, 2013, Petitioner United States filed a Motion requesting the Court to enter

2    judgment for contempt and impose a fine of $7,500 upon Respondent.  Dkt. No. 53 (Motion for

3    Entry of Judgment for Contempt) ("Motion").  The United States contends that Respondent failed

4    to substantially comply with the order enforcing summons by April 1, 2013, and therefore, is

5    liable for $500 per day from March 1, 2013, as specified in the contempt order.  The United States

6    notes that the Bankruptcy Court already incarcerated Respondent for failing to provide similar

7    information, but released him because further incarceration was unlikely to induce compliance.

8    Petitioner believes that it will be easier to attempt collection without seeking information from

9    Respondent, because none is ever provided.  *Id*. at 11-12.  For that reason, the United States seeks

10   to terminate this case and asks for the imposition of a fine of $7,500 based on Respondent's

11   noncompliance.

12   In order for the Court to hold Respondent in contempt, Petitioner must show "(1) that

13   [Respondent] violated the court order, (2) beyond substantial compliance, (3) not based on a good

14   faith and reasonable interpretation of the order, (4) by clear and convincing evidence."

15   *Labor/Cmty. Strategy Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th

16   Cir. 2009) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.,* 10 F.3d 693, 695

17   (9th Cir. 1993)).  "Willfulness is not an element of civil contempt."  *United States v. Asay*, 614

18   F.2d 655, 661 (9th Cir. 1980) (citing *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 69 S.Ct.

19   497, 93 L.Ed. 599 (1948) ("An act does not cease to be a violation of a law and of a decree merely

20   because it may have been done innocently.").  A person fails to comply with a court order when he

21   or she "fails to take all reasonable steps within his power to insure compliance with the court's

22   order."  *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987) (quotations

23   and alterations omitted).

24   Judge White has already issued an order holding Respondent in contempt.  *See* Dkt. No.

25   48.  That order indicated that Respondent failed to comply with Judge White's previous order

26   enforcing the IRS summons requiring Respondent to appear on or before September 20, 2011 to

27

28

certifies the facts described in this Report and Recommendation.

United States District Court
Northern District of California

give testimony and produce documents relating to the Estate of Jeanette Ottovich.  *See id.* at 1-2.
Thus, it has already been established that Respondent "violated the court order" to enforce the IRS
summons.  *Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1123.

Judge White's order holding Respondent in contempt specified that the $500 per day fine
would be purged if Respondent complied with the order enforcing summons by April 1, 2013.
Dkt. No. 48 at 2.  Thus, the remaining issue to be decided is whether Petitioner has shown, by
clear and convincing evidence, that Respondent failed to substantially comply with the Court's
enforcement order by April 1, 2013, and that his noncompliance was not based on a good faith and
reasonable interpretation of the enforcement order.  *Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1123.

A number of arguments raised in Respondent's opposition brief have already been decided.
*See* Dkt. No. 63 (Defendant's Opposition to Motion for Contempt) ("Opp.").  Respondent argues
that the IRS is already in possession of documents Respondent was ordered to produce, and
further, that the Estate of Jeanette Ottovich does not have any tax liability to the IRS, and
therefore, the information sought is not relevant.  These issues, however, were already decided
when Judge White issued his order enforcing the IRS summons.  Respondent appealed Judge
White's order enforcing the summons, and the Ninth Circuit affirmed.  *See* Dkt. Nos. 26, 30, 41.

The Supreme Court has clearly stated that "[i]t would be a disservice to the law if we were
to depart from the long-standing rule that a contempt proceeding does not open to reconsideration
the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of
the original controversy."  *United States v. Rylander*, 460 U.S. 752, 756-57 (1983) (quoting
*Maggio v. Zeitz*, 333 U.S. 56, 69 (1948)).  Respondent's arguments relating the relevancy of the
information sought by the IRS, the IRS's pursuit of documents already in its possession, and the
overall tax liability of the Estate of Jeanette Ottovich, are arguments that either were raised or
should have been raised during the enforcement proceeding.  Accordingly, the Court does not
address such arguments here, and instead considers the narrow question of whether Respondent
substantially complied with the order finding him in contempt by failing to comply with the IRS
summons on or before April 1, 2013.

Judge White's order finding Respondent in contempt required Respondent to provide "the

records and testimony sought in the summons on or before April 1, 2013." Dkt. No. 48 (Contempt Order) at 2; *see also* Dkt. Nos. 1 at 5 (Summons); Dkt. No. 28 at 4 (Enforcement Order).  First, Respondent failed to produce any records sought in the summons.  According the Mr. Nolan, Respondent "did not attempt to give [him] documents other than statement asserting his 5th Amendment rights."  Nolan Decl. ¶ 10.  In his declaration, Respondent writes: "I brought some documents with me on April 1, 2013 for which I was never asked for to be examined, or copied during my time at the deposition on April 1, 2013."  Ottovich Decl. ¶ 6.  However, Mr. Nolan was not charged with the duty to specifically ask Respondent whether he had brought documents.  It was Respondent's obligation "to take all reasonable steps within his power to insure compliance with the court's order." *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d at 1365.

Moreover, it is clear from the transcript of the April 1, 2013 interview that Respondent did not substantially comply with his obligation to provide sworn testimony, and instead improperly asserted Fifth Amendment privilege to avoid answering questions, was generally evasive by feigning memory loss and lack of knowledge, and provided answers inconsistent with his public filings in other cases.  The following analysis addresses these points in further detail.

**A.      Fifth Amendment Privilege**

Respondent asserted Fifth Amendment privilege at numerous times throughout the IRS interview.  "The Fifth Amendment protects individuals from having to disclose documents when the very act of production would constitute self-incrimination."  *United States v. Bright*, 596 F.3d 683, 688 (9th Cir. 2010).  "A claim of Fifth Amendment privilege may be asserted if there are 'substantial hazards of self-incrimination that are real and appreciable, not merely imaginary and unsubstantial,' that information sought in an IRS summons might be used to establish criminal liability." *Id.* at 690-91 (quoting *United States v. Drollinger,* 80 F.3d 389, 392 (9th Cir. 1996) (per curiam) (quoting *United States v. Rendahl,* 746 F.2d 553, 555 (9th Cir. 1984))).

It was not improper for Respondent to assert his Fifth Amendment privilege for the first time at the April 1, 2013 interview.  "A proper application of this standard requires that the Fifth Amendment be raised *in response to specific questions* propounded by the investigating body." *Bright*, 596 F.3d at 691 (citations and alterations omitted) (emphasis added).  In *Rendahl*, the

14

United States District Court
Northern District of California

1  Ninth Circuit held that Fifth Amendment claims could be raised in the contempt proceeding when

2  the defendants did not have the opportunity to raise the defense in the enforcement proceeding.

3  *Rendahl*, 746 F.3d at 555 (A person must have the chance to "present himself for questioning, and

4  as to each question elect to raise or not to raise the defense."); *cf. United States v. Brown*, *United*

5  *States v. Brown*, 918 F.2d 82, 84 (9th Cir. 1990) (per curiam) (assertion of blanket Fifth

6  Amendment privilege could not be raised at contempt hearing after blanket assertion was rejected

7  at enforcement hearing).  In this case, Respondent answered the IRS's questions for the first time

8  on April 1, 2013.  Therefore, this case is similar to *Rendahl*, such that the *timing* of Respondent's

9  invocation of the Fifth Amendment privilege was proper.

10        Nevertheless, even if the timing of Respondent's assertion of Fifth Amendment privilege

11  was proper, Respondent still "bears the burden of showing that testimony or documents are

12  privileged."  *Bright*, 596 F.3d at 691; *see also United States v. Rylander*, 460 U.S. 752, 758 (1983)

13  ("[T]he assertion of the Fifth Amendment privilege against compulsory self-incrimination … has

14  never been thought to be in itself a substitute for evidence that would assist in meeting a burden of

15  production.").  In *United States v. Rendahl*, 746 F.2d 553, 554 (9th Cir. 1984), the Ninth Circuit

16  held that three individuals summoned by the IRS established "the likelihood of incrimination" by

17  making an *in camera* offer of proof showing that the sought testimony would be incriminating.  *Id.*

18  at 556.  The Ninth Circuit has also held, however, that a summoned individual does not satisfy this

19  burden by making a mere blanket assertion of privilege, *Brown*, 918 F.2d at 84, or when the

20  evidence submitted to show privilege is a mere "foregone conclusion and the taxpayer adds little

21  or nothing to the sum total of the Government's information…," *Bright*, 596 F.3d at 692.

22        Respondent failed to submit *any* evidence supporting his claim for privilege, and therefore,

23  has failed to satisfy his burden of establishing his right under the Fifth Amendment to not comply

24  with the enforcement order.  *See Bright*, 596 F.3d at 691.  In fact, in his opposition brief and

25  evidence submitted in support thereof, Respondent does not once defend his various assertions of

26  privilege, aside from contending that he "asserted the privilege of the Fifth Amendment pursuant

27  to 'his' best understanding of the law on some select questions."  Opp. at 5; *see also* Ottovich

28  Decl. ¶ 8.  This is insufficient, however, because Respondent's defense is contrary to the "general

1  rule that ignorance of the law is no excuse." *U. S. v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558,

2  563 (1971).

3      Even if Respondent had made an offer of proof to support his claim of privilege, it is clear

4  that such a claim could not be supported with regard to several questions for which Respondent

5  asserted the privilege.  As a matter of law, Respondent had no right to assert privilege and refuse

6  to answer questions regarding, for example, the last two digits of his Social Security number, his

7  date of birth, his sister Karen Rayl's occupation, where his brother Harvey Ottovich does his

8  banking, or whether he was a party to a lawsuit or filed for bankruptcy.  It is impossible to

9  conceive how such information "might be used to establish criminal liability." *Bright*, 596 F.3d at

10 691.  Indeed, the transcript reveals that Respondent repeatedly asserted the privilege when he had

11 concerns regarding the *relevancy* or the *personal nature* of the questions asked, but revealed no

12 concern regarding self-incrimination.  *See* Transcript at 7:12-14 (refusing to answer a question

13 regarding whether he has children and stating: "I'm refusing to answer that question, that under

14 the Fifth Amendment that this has nothing to do with Jeannette Ottovich"); 13:6-7 (refusing to

15 answer a question regarding who owns 37231 Mission Boulevard and stating: "I'm just going to

16 go ahead and plead the Fifth.  It has no relevancy").  An assertion of Fifth Amendment privilege to

17 avoid answering irrelevant questions is legally inaccurate.  The fact Respondent may have

18 misunderstood the purpose of the Fifth Amendment privilege is legally irrelevant.

19      **B.**      **General Evasiveness through Feigned Memory Loss and Lack of Knowledge**

20      In *Battaglia*, the Ninth Circuit held that "general evasiveness" and "a false assertion of

21 memory loss does constitute a refusal to testify" within the meaning of 28 U.S.C. § 1826, which

22 governs recalcitrant witnesses.  *Matter of Battaglia*, 653 F.2d 419, 422 (9th Cir. 1981).  The court

23 reasoned that "if an evasive answer were not equated with a refusal to answer, even the most

24 transparently false assertion of 'I don't remember' would be sufficient to avoid the recalcitrant

25 witness statute" and "would provide an easy avenue for the reluctant witness to escape [an

26 obligation to testify] with impunity." *Id*.  While the *Battaglia* court specifically considered an

27 individual's assertion of memory loss, the Second Circuit has applied the reasoning in *Battaglia* to

28 assertions of "lack of knowledge" as well.  *See In re Bongiorno*, 694 F.2d 917, 922 (2d Cir. 1982)

United States District Court
Northern District of California

16

1   (citing *Battaglia* and finding the witness's responses of "lack of knowledge" and lack of memory

2   as plainly false and evasive assertions designed to impede a grand jury's investigation); *see also In*

3   *re Weiss*, 703 F.2d 653, 667 (2d Cir. 1983).

4          In *Battaglia*, the Ninth Circuit wrote that "[a] civil contempt proceeding on a witness'

5   asserted memory loss requires a three-step analysis that shifts the burden of production to the

6   witness, but always leaves the burden of proof with the government." *Battaglia*, 653 F.2d at 422.

7   First, the government "must make a prima facie showing of contempt…." *Id.* (citation omitted).

8   Second, "once the government has presented its prima facie case, the witness must provide some

9   explanation on the record for his failure to comply." *Id.* (citation omitted). "If the witness fails to

10  meet this burden of producing evidence, the government's prima facie case is sufficient to meet its

11  burden of proof for a finding of contempt." *Id.* (quotations and citation omitted). "Finally, if the

12  witness meets his burden of production by claiming a loss of memory, the government must carry

13  its burden of proof for a finding of contempt by demonstrating that the witness in fact did

14  remember the events in question, thereby establishing a willful failure to comply." *Id.* at 422-23

15  (citations omitted). "The government may satisfy its burden of proof by establishing by clear and

16  convincing evidence that the witness' claimed inability to remember is not credible." *Id.* at 423.

17         At the IRS interview, Respondent asserted that he did not remember the answers to some

18  questions, and stated that he did not know the responses to several others. Therefore, under the

19  framework outlined in *Battaglia*, the government has established a prima facie case for contempt

20  based on lack of memory and/or lack of knowledge of the answers to such questions. Pursuant to

21  Judge White's enforcement order, the IRS made an authorized request for information which

22  Respondent failed to provide. *Battaglia*, 653 F.2d at 422.

23         The burden of production then shifts to Respondent to provide some explanation for his

24  failure to comply. *Id.* Respondent writes in his declaration that "[t]he questions about the Estate

25  were answered to the best of [his] recollection." Ottovich Decl. ¶ 7. He further writes that he

26  "was nervous about testifying before the IRS" and that he has "a problem with memory" for which

27  he takes medication. *See id.* ¶¶ 4-5 and Exhibit 2 (receipts showing that Respondent has

28  purchased Ginkgo Biloba Extract, BrainEdge, and Acetyl-L-Carnitine to help his memory). At the

17

IRS interview, Respondent testified that he has a problem with memory loss, and takes medication the help him with his memory, but he was not sure of the exact medication. Transcript at 4:19-5:13. While Respondent's evidence is bare-boned and Respondent fails to particularize his assertions of memory loss for any specific question, the undersigned will assume for purposes of the following analysis that Respondent fulfills his burden of production. Thus, the burden shifts back to the government to prove by clear and convincing evidence that the claims of lack of memory and knowledge are not credible.

With respect to at least two questions to which Respondent claimed he did not know or did not remember the answer, the government has met its burden by of showing Respondent's representations are not credible by citing Respondent's public filings in other cases. At the IRS interview, Respondent claimed to not remember who has control of M.O.R.E. Partners, LLC. Transcript at 25:10. However, in the complaint filed by Respondent and M.O.R.E. alleging wrongful levy and seeking to quiet title, Respondent alleges that *he* and his siblings are equitable owners of M.O.R.E. *See* Complaint, *M.O.R.E., LLC, et al. v. United States*, No. 12-3609-JST (N.D. Cal July 11, 2012), Dkt. No. 1 ¶ 4. Thus, Respondent's assertion that he does not know who has control of M.O.R.E. is not credible.

In addition, Respondent testified at the interview that he did not know whether the property located at 15600 Lorenzo Avenue, San Lorenzo, California was transferred after the death of Jeanette Ottovich or after the Form 706 had been filed. Transcript at 11:4-7. However, in a declaration Respondent submitted in his brother Harvey Ottovich's bankruptcy proceeding, Respondent wrote that after his father's death (which was after his mother's death), "15600 Lorenzo Ave. was transferred to both Harvey and to me." Declaration of Mark Ottovich in Response to Order to Show Cause re: Contempt, *In re Harvey G. Ottovich*, No. 11-73193 (Bankr. N.D. Cal), Dkt. No. 43 ¶ 11. Thus, Respondent's assertion that he does not know whether the property located at 15600 Lorenzo Avenue was transferred is not credible.

**C.**   **Answers Inconsistent with Respondent's Other Public Filings**

Respondent also provided many answers at the IRS interview that are in direct contradiction to his own public filings. The fact so many of Respondent's answers are

United States District Court
Northern District of California

contradicted by his own prior statements provides strong indicia that Respondent was not truthful at the interview.  These inconsistent answers, when considered in conjunction with the improper assertions of Fifth Amendment privilege and feigned memory loss and lack of knowledge, support the undersigned's recommended finding that Respondent failed to substantially comply with the enforcement order.

Respondent testified at the IRS interview that he did not own any property and that the value of his assets was zero.  *See* Transcript at 20:18-21:7.  However, this is contradicted by Respondent's earlier representations in this case.  In his declaration submitted in opposition to the order to show case regarding enforcement of the IRS summons, Respondent claimed that his sister Ms. Rayl filed a Form 706 regarding the tax liability of the Estate of Jeannette Ottovich that "was wrong in a number of crucial aspects."  Dkt. No. 16 ¶ 3.  Respondent declares that because his sister Ms. Rayle "was unfamiliar with the business affairs of her brothers, she included *a number of assets* in the estate *that actually belonged to [Respondent] and [his] brother Harvey Ottovich.*"  *Id*. (emphasis added).  Thus, Respondent represented in this proceeding that he owns "a number of assets," which contradicts his testimony that he does not own any property and that the total value of his assets is zero.

Moreover, in the complaint alleging wrongful levy by the IRS, Respondent alleged that "at all times, the sole equitable owner of [the property located at 15601 Washington Avenue, San Lorenzo, California] was Mark Ottovich."  *See* Complaint, *M.O.R.E. LLC, et al. v. United States, et al.*, No. 12-3609-JST (N.D. Cal. July 11, 2012), Dkt. No. 1 ¶ 25.  The complaint in that action specified that Respondent purchased this property "and assigned title to his parents out of escrow pursuant to an oral trust agreement whereby Mark retained equitable ownership…."  *Id*. ¶ 15.  At the IRS interview, Respondent testified that he believed the property located at 15601 Washington Avenue was owned by M.O.R.E. LLC.  Transcript at 12.

Furthermore, in a declaration filed in connection with Harvey Ottovich's bankruptcy proceeding, Respondent wrote that he "began buying property when [he] was about 21 years old."  Declaration of Mark Ottovich in Response to Order to Show Cause re: Contempt, *In re Harvey G. Ottovich*, No. 11-73193 (Bankr. N.D. Cal.), Dkt. No. 43 ¶ 8.  While Respondent also indicates that

United States District Court
Northern District of California

a number of these properties were transferred to his siblings or to M.O.R.E. LLC, he also writes in this same declaration that "[i]n a court stipulation, 15600 Lorenzo Ave. was transferred to both Harvey and to me." *Id.* ¶ 11.  On February 4, 2013, Respondent also filed a voluntary petition for bankruptcy in which he represented that he had either "legal, equitable, or future interest" in the property located at 32755 Mission Boulevard.  *See* Voluntary Petition, *In re Mark Ottovich*, No. 13-40649 (Bankr. N.D. Cal. Feb. 4, 2013), Dkt. No. 1 at 7.

Another declaration submitted by Respondent in Harvey Ottovich's bankruptcy case is also inconsistent with his testimony during the IRS interview that he had no source of income and that his brother Harvey Ottovich paid his expenses.  *See* Transcript at 7:18, 22.  In this declaration, Respondent wrote that even if Harvey Ottovich held properties in his name, "Harvey has never been involved in property management such as talking to prospective tenants or the collection of rents."  Declaration of Mark Ottovich in Response to Trustee's Motion to Strike and Bar Further Filings, *In re Harvey G. Ottovich*, No. 11-73193 (Bankr. N.D. Cal. June 19, 2012), Dkt. No. 65 ¶ 4.  He further wrote: "The money goes to me Mark Ottovich and also has on all properties in Harvey's name."  *Id.*

*          *          *

For the foregoing reasons, there is clear and convincing evidence that Respondent failed to substantially comply with the enforcement order by April 1, 2013.  The only question that remains is whether Respondent's failure to comply was based on a good faith and reasonable interpretation of the order.  *Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1123.  Because there is no indication that Respondent's failure to comply was based on a good faith and reasonable interpretation of the order, the undersigned recommends Respondent not be purged of contempt.

A civil contempt sanction may be either compulsory or compensatory in nature.  *See United States v. Asay*, 614 F.2d 655, 659 (9th Cir. 1980).  The initial civil contempt fine of $500 per day was a compulsory fine intended to coerce Respondent's compliance with the enforcement order.  In light of the fact Respondent was incarcerated by the Bankruptcy Court for ten days and then released because further incarceration was unlikely to induce compliance, Petitioner now asks the court to impose a $7,500 compensatory fine so that this matter may be closed.

"The amount of a compensatory contempt fine is in the discretion of the court." *Asay*, 614 F.2d at 659 (citing *U.S. v. United Mine Workers*, 330 U.S. 258, 304 (1947)).  The undersigned finds that the imposition of a $7,500 fine is reasonable for two reasons.  First, having failed to substantially comply with the enforcement order by April 1, 2013, Respondent is already required by the contempt order to pay $500 per day from March 1, 2013, which amounts to $115,000 for the 230 days between March 1, 2013 and October 17, 2013.  Petitioner seeks to reduce this fine to $7,500, which is less than ten percent of the total contempt fine of $115,000.

Moreover, the United States expended numerous resources in an effort to induce Respondent's compliance.  "Ordinarily the amount of a compensatory fine is the actual damage caused to petitioner by respondent's contumacious act." *Asay*, 614 F.2d at 660.  Before filing the verified petition to enforce the summons, the IRS summoned Respondent and arranged for him to appear at the IRS office on two different dates.  Petitioner filed a motion to enforce the summons, which was granted and then appealed by Respondent to the Ninth Circuit.  Petitioner filed two motions to hold Respondent in contempt, the second of which was granted.  The IRS then met with Respondent, but he refused to provide sworn testimony as required by the summons despite already being held in contempt.  Petitioner then had to file the instant motion. Therefore, the $7,500 to compensate the government for its failed efforts to induce Respondent's compliance is reasonable.

## IV.    RESPONDENT'S MOTION FOR TERMINATING SUMMONS PER EQUITABLE RECOUPMENT AND/OR REQUEST FOR QUALIFIED DETERMINATION

In addition to opposing Petitioner's Motion for Entry of Judgment of Contempt, Respondent has filed his own motion seeking to terminate the summons.  *See* Dkt. No. 62 (Motion to Terminate Summons per Equitable Recoupment and/or Request for Qualified Determination) ("Motion to Terminate Summons").  In the Motion to Terminate Summons, Respondent contends no tax liability is owed by the Estate of Jeanette Ottovich, and therefore, he should not "be subject to unnecessary examination or investigations" by the IRS.  *See* 26 U.S.C. §§ 7605.

Respondent's Motion must be denied because it requests relief beyond the jurisdictional scope of this case.  This case was filed under §§ 7402(b) and 7604(a) of the Internal Revenue

United States District Court
Northern District of California

1    Code, 26 U.S.C. §§ 7402, 7604.  Federal courts are courts of limited jurisdiction, and "possess

2    only that power authorized by Constitution and statute."  *Estate of Branson v. C.I.R.*, 264 F.3d

3    904, 908 (9th Cir. 2001) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377

4    (1994).  While § 7602 "grants the Secretary or his delegate wide latitude to summons information

5    necessary for investigative purposes," the "government may seek judicial enforcement of the

6    summons under § 7604."  *United States v. Jose*, 131 F.3d 1325, 1327 (9th Cir. 1997).  These

7    sections do not grant the district court jurisdiction to determine overall tax liability of the

8    summoned individual.  *See id.*

9          In *Jose*, the Ninth Circuit overruled its previous determination that a district court may

10   "conditionally" enforce an IRS summons, such as prohibiting the IRS from sharing produced

11   documents with the Office of the United States' Attorney.  *Jose*, 131 F.3d at 1328-29.  The Ninth

12   Circuit agreed with the Fifth Circuit that " '[t]he sole purpose of the enforcement proceeding is to

13   ensure that the IRS has issued the summons for proper purpose and in good faith,'" and held that

14   "the district court is strictly limited to enforcing or denying IRS summonses."  *Id.* at 1329 (quoting

15   *United States v. Barrett*, 837 F.2d 1341, 1350 (5th Cir. 1988)).  The Fifth Circuit wrote in *Barrett*:

> In a summons enforcement proceeding, the district court's only task
> is to determine whether the summons should or should not be
> enforced. This inquiry is limited to ensuring that the government has
> complied with the four *Powell* criteria, and that its process is not
> being abused. *There is no statutory authority*, nor Congressional
> indication that existing statutes supply the authority, nor Supreme
> Court authority, *to allow the district court to make any
> consideration except whether to enforce or not enforce the
> summons....* There is no middle ground because to create that
> remedy would unduly hamper the investigative efforts of the IRS.

22   *Barrett*, 837 F.2d at 1350 (citations omitted) (emphasis added).

23         In his Motion, Respondent asks for much than the de minimus condition imposed by the

24   district court in *Jones*.  Respondent requests the Court to determine that there is no tax liability at

25   all.  This request is far beyond the scope of the narrow framework in which Congress authorized

26   district courts to either grant or deny a petition to enforce an IRS summons.  *Jose*, 131 F.3d at

27   1328-29.

28

United States District Court
Northern District of California

1    Moreover, the issue of the propriety of the summons has already been litigated in this court

2  and in the Ninth Circuit.  In those proceedings, the summons was found proper and was

3  enforced−and Respondent was found in contempt.  He may not re-litigate those issues.

4  Accordingly, it is recommended that Respondent's Motion be DENIED.

5  **V.    CONCLUSION**

6    For the reasons stated above, it is recommended that Petitioner's Motion for Entry of

7  Judgment of Contempt be GRANTED and that a $7,500 fine be assessed against Respondent.  It is

8  further recommended that Respondent's Motion for Terminating Summons per Equitable

9  Recoupment and/or Request for Qualified Determination be DENIED.  Any objections to this

10  Report and Recommendation shall be made within fourteen days (14) of the date of its filing.

11

12  Dated: October 17, 2013

13  _____

14  JOSEPH C. SPERO
    United States Magistrate Judge